Argued at Pendleton May 4; affirmed June 15, 1943

## JENKINS v. JENKINS ET AL.

(138 P. (2d) 904)

Before BAILEY, Chief Justice, and BELT, ROSSMAN, and LUSK, Associate Justices.

*P. J. Gallagher,* of Ontario (Pat H. Donegan, of Burns, on the brief) for appellant.

*Leonard Waterman,* of Burns (Biggs & Waterman, of Burns, on the brief) for respondents.

ROSSMAN, J. This is an appeal by the plaintiff from a decree of the circuit court which, after dismissing her complaint, holds that defendant John R. Jenkins is the owner of the property involved in this proceeding, and enjoins the plaintiff from trespassing upon it.

The properties mentioned in both the complaint and the answer are located in Township 24 South, Range 30, East Willamette Meridian, in Harney county. That being true, we shall not hereafter repeat those portions of the descriptions. The complaint, after describing the west half of Section 9, seeks to quiet title to it. The answer, in addition to denying the plaintiff's averment of her ownership and possession, alleges that the defendant, John R. Jenkins, to whom we shall hereafter refer as the defendant, is the owner of a tract of land

"in Section Eight (8) and in Section Nine (9), Township Twenty-four (24) South, Range Thirty

(30) E. W. M., in Harney County, Oregon and described as follows:

"Beginning at the Southwest corner of Section Nine (9) and proceeding Northeast along the fence line of defendant John R. Jenkins, and inclosing certain buildings including a ranch house, stone cellar, warehouse, granary and other improvements to the West of the aforesaid defendants fence line and all land and improvements to the West of said fence line within Section Nine (9), Township Twenty-four (24) South, Range Thirty (30) E. W. M., in Harney County, Oregon."

Continuing, the answer avers, among other matters, that the

"defendant, John R. Jenkins, has been in possession of said land for more than fifty years and that within a short time after securing possession thereof and upwards of forty years before the filing of plaintiffs suit, erected a residence thereon. That since said time he has also built other buildings including a stone cellar and warehouse, granary, and other improvements and buildings within his inclosure.

"* * * defendant, John R. Jenkins, his tenants and employees have been in open, notorious, adverse and peaceable possession thereof for more than fifty years."

The reply denies those averments.

The land in dispute is not all of Sections 8 and 9, but only the part specifically described in the answer.

April 29, 1937, the plaintiff received from the sheriff of Harney county a sheriff's deed which described and conveyed to her the west half of Section 9. This deed, the validity of which is not questioned, was executed by the sheriff as the final step in the foreclosure of a mortgage which described the west half of Section 9, and is the sole source of plaintiff's title.

The attacked decree holds:

"The defendant, John R. Jenkins, is the owner in fee simple of a tract of land in Section 8 and Section 9, Township 24 South, Range 30 east of the Willamette Meridian, in Harney County, Oregon, described as follows:

"Beginning at the Southwest corner of Section Nine (9) and proceeding Northeast along the fence line of defendant, John R. Jenkins, and inclosing certain buildings including a ranch house, stone cellar, warehouse, granary and other improvements to the West of the aforesaid defendant's fence line and all land and improvements to the West of said fence line within Sections Eight and Nine  *  *  *."

The appellant (plaintiff) presents only two assignments of error. The first is:

"The court below erred in holding that the respondent's established title by prescription to the land in controversy, and in not holding that the appellant was the owner and entitled to the possession of it."

The second assignment of error challenges a ruling of the trial judge which excluded some declarations about the land which the plaintiff claimed Thomas E. Jenkins, a brother of the defendant, made to her.

It will be seen from the preceding paragraph that we are not called upon to determine whether the fence, mentioned in both answer and decree, stands upon the true line that separates Sections 8 and 9. For present purposes, we assume that it does not. It is the land between that fence and the true line, which separates Sections 8 and 9 (assuming that the fence does not stand upon the true line) which is the subject-matter of this suit.

We shall now consider the first assignment of error.

In 1892 the defendant received from James M. and L. J. Parker, husband and wife, a deed of conveyance to the north ½ of the southeast ¼ and the northeast ¼ of the southwest ¼ and the southeast ¼ of the northeast ¼ of Section 8. In 1901 he received a deed of conveyance to the south ½ of the southeast ¼ of Section 8. He swore that in 1892 when he made the first of these purchases, a fence extended along the easterly line of the two properties and that the aforementioned James M. Parker took him to the southerly end of the fence and there told him that the fence stood upon a corner of the land. "Mr. Parker showed me the corner of the land there" are the defendant's words. Parker had entered upon the land some years previously as donation land claimant and before selling the property to the defendant had received a patent from the government. The defendant has been the sole owner of all the land granted to him in those two conveyances ever since his receipt of the deeds, with the exception of the period of 1902 to 1906. In 1902 he and his brother, Thomas E. Jenkins, formed a partnership which engaged in the livestock business. When the partnership was formed, the defendant conveyed to his brother a half interest in the land. The latter was reconveyed in 1906 when the partnership was terminated.

By glancing at the following plat, it will be seen that it indicates a fence. We placed the fence as nearly as we could in harmony with the contentions of the plaintiff, whose witnesses swore that it stood a little east of the line which separates Sections 8 and 9. It is the same fence which the defendant mentioned. He contends that if the fence is not upon the true line which marks the easterly line of Section 8 and the westerly

line of Section 9, it is very near to that line. The space, if any, between the true line and the fence is the strip of land contested by the parties.

Sections 8 & 9, Twp. 24 S., R. 30 E. W. M.

It will be observed that the fence does not run at a right angle to the line which is the southerly boundary of Sections 8 and 9. Section lines in Harney county appear to be on a variation of 21 degrees east. According to many of the witnesses, the fence runs in a straight unbroken line three-fourths of a mile from its beginning point at or near the southeast corner of Section 8 and then turns westerly. A witness explained that the turn to the northwest was necessitated by the stony character of the ground which was encountered at the point where the change in direction begins.

By reverting to the plat, it will be observed that it indicates that a house stands in the disputed area. The defendant testified that when he made his purchase in 1892 a house stood upon the land and that still later, after he had leased the property to an individual named Henderson Elliott, the latter moved the house to its

present location. According to the defendant, he showed Elliott the government corner which marked the initial point of the true line before the house was moved. It was at the southerly end of the fence. Some time after the house had been moved, the defendant spent a substantial sum in remodeling it, and still later he constructed the barn and stone cellar which the plat indicates. He also built a granary and chicken house in the area which the plaintiff now claims. Our plat contains a representation of a spring. It is located in the disputed area.

Unless there is included in Section 9 the disputed area, it contains improvements of small value. Its soil is alkali and seemingly is unsuited for agricultural purposes. Native grass grows upon Section 8.

Since 1892, when the defendant purchased the tract which was improved with the house, he has been in continuous possession of the property. He lived in the house for only a few years, but in many of the years rented the property to tenants. In recent years the defendant permitted his aforementioned brother Thomas to occupy the property.

The defendant insists that if the fence is east of the true line which separates Sections 8 and 9, then he acquired by adverse possession title to all of the land in Section 9 which lies between the true line and the fence. In an endeavor to refute that contention, the plaintiff relies upon the principle that possession up to a line, with intent to claim only to the true line when discovered, is not hostile, and upon the following testimony which the defendant gave:

"Q. When was it, Mr. Jenkins, that you first learned that the house and some of these other improvements were located in Section Nine?

"A.  I never did learn it.

"Q.  Well, did you ever hear anyone claim that they were located in Section Nine?

"A.  I always claimed that on Section Eight, that's all I ever claimed, I never claimed any land in Section Nine.

"Q.  And I understand what you claimed was limited to lands that were actually in Section Eight, is that correct?

"A.  That's all I claimed.

"Q.  And whatever is in Eight you want; Section Eight, you own that, whatever land belongs in Section Eight, that is yours?

"A.  What I claim, yes; about two hundred and forty acres.

"Q.  Whatever land lies in Section Nine, that is the other fellow's?

"A.  That is his lookout, yes.

"Q.  You don't want your neighbor's land and you don't want your neighbor to have your land?

"A.  No, sir."

We observe, however, that the defendant also testified:

"Q.  Mr. Jenkins, in reference to the fence, am I correct in the statement that it is your contention the fence is on the section lines between eight and nine?

"A.  Yes, sir.

"Q.  And when you made the statement this morning that you claimed only land in Section Eight, it was in relation to your belief that the fence is on the section line?

"A.  On the section line, yes, sir.

"Q.  In other words, you claim all the land up to the fence?

"A.  Yes, sir."

In addition to the foregoing testimony bearing upon the intention which accompanied the defendant's possession of the contested strip, the record reveals the facts already mentioned; that is, (a) when he made his purchase, his vendor took him to the southerly end of the fence and told him that it marked the government corner; (b) the defendant has retained possession of the land ever since; (c) he permitted the house to be moved into the area now the subject of dispute; (d) the defendant built a barn, a stone cellar and other structures in the area now in contest; and (e) so far as the record shows, he treated the area which the plaintiff now claims in the same manner as the rest of the tract; that is, as his own.

In order to afford an adequate understanding of the other principal item of evidence (an affidavit), with which the plaintiff seeks to show that the defendant's possession of the contested strip was not adverse, we must go back to the year 1912. In that year the aforementioned Thomas Jenkins purchased the westerly half of Section 9. His vendor was the Oregon & Western Colonization Company which was represented in the transaction by an agent, B. F. Johnson. The latter testified that his employer owned all of the land in an area six miles wide stretching from Blue Lake on the easterly slope of the Cascade Mountains to the city of Ontario.

In 1911 and 1912, Johnson, according to his testimony, surveyed and classified all of the land just mentioned. He swore that he ran off the section lines and drew a plat of each section which showed its physical characteristics and type of soil. Johnson conceded that his knowledge of surveying was limited. In the summer of 1912 while he was performing this work

in Harney county he came upon Section 9. When he surveyed it he discovered, so he testified, that the house was east of the line that separates Sections 8 and 9. In order to be sure, he employed a qualified surveyor and was told that his lines were accurate. We now quote from his testimony:

"It was my understanding that Tom and John Jenkins owned the adjoining property and I went to Mr. Tom Jenkins and showed him the plat."

By "the adjoining property" he, of course, meant Section 8. We quote again from his testimony:

"I dickered with him for a deal for the land, which he took; and I sold it to him."

He meant Thomas Jenkins.

Thomas Jenkins made the purchase through the medium of a written contract which he and the Oregon & Western Colonization Company signed June 18, 1912. It mentioned a purchase price of $3,000 and acknowledged receipt of a payment of $1,500.

Although Johnson could recall nothing about the matter, he acknowledged his signature to an affidavit, signed October 7, 1912, which reads as follows:

"I, Benjamin F. Johnson, being first duly sworn, depose and say that on October fifth, 1912, on the sidewalk in front of the Davis barber shop in Burns, Oregon, I asked Mr. John Jenkins who owns land in Section eight adjoining Section nine in Township 24 South, Range 30 East, W. M. to sign a quit-claim deed to the west one-half of said Section nine, and he (Mr. Jenkins) stated that he did not now nor never did claim any part of said Section nine, and that he would not sign any statement, or quit-claim deed, but when the land was surveyed under an official survey if any of said Section nine was under his fence he would comply to the survey, and move his fence onto the official survey line.

"I further depose and say that a Mr. Chas. Johnson of Van, Oregon, was standing by and heard Mr. Jenkins make the above statement to me.

"I further depose and say that with Mr. Jenkins I walked from the place where he (Mr. Jenkins) made the above statement direct to the office of the Oregon & Western Colonization Company in Burns, Oregon, and in said office in the presence of myself and John R. Stinson, Mr. Jenkins stated that he did not now nor never did claim any part of said Section nine, and that when an official survey was made if any of said Section nine was in his field that he would lay no claim to the land fenced."

That is the affidavit upon which the plaintiff relies.

Johnson also acknowledged his signature to a letter, dated July 3, 1912, addressed to his employer, which reads:

"In reply to your letter of June 6 in regard to the application of Thomas E. Jenkins for the W½ Sec. 9-24-30.

"I have today went over this tract and I herewith enclose a map of same, Card will follow soon.

"You will note on the map there is a house near the west quarter corner, also the fence on the W½ SW¼, that part west of the fence is in a field owned by a Brother of Mr. Jenkins, and he has had possession since he purchased it from a Mr. Parker in 1891, the house also belongs to the same man.

"There is no doubt in my mind but the southwest corner has been moved east approximately 200 feet, this no doubt was done before Mr. Jenkins bought the place, and was done to place the house and spring on even section, while I am quite sure my survey is correct of course it would take a official survey to determine the west line of the section, and it may be Mr. Jenkins would be able to hold that part under fence.

"I called on Mr. Thomas E. Jenkins today but was unable to raise him.

"If you think Mr. Jenkins could hold the part under fence if he so desires it would reduce my value. Mr. Thomas Jenkins said his Brother may be in town soon, and I told him to bring him in and I would talk to him about the part he has fenced, I will try to get it loose if possible, please advise what you think of the mixup.

"I had been dealing with Mr. Jenkins for about two weeks and was holding him up to $3500.00, so when Mr. Stinson came over we went to the tract and he thought with half down and the other half in one year it was best to let it go.

"If the money is to be returned to Mr. Jenkins please advise me how to do it for I have reported it to your office."

■ When Johnson was shown the affidavit and the letter he said that he had no independent recollection of the facts narrated in either of them. His words were: "Only from the affidavit; it has been too long ago. * * * No, sir, only by that letter." He swore, however, that the two documents were written when the facts "were fresh in my mind." The affidavit and the letter were, therefore, past recollection that had been recorded by him, and his testimony was admissible: § 4-707, O. C. L. A., and Wigmore on Evidence, 3d ed., § 737.

The defendant, after testifying that he recalled quite clearly the incident mentioned in Johnson's affidavit, testified as follows:

"I met Mr. Johnson on the street, happened to be in town here after my mail. In them days we had to come to Burns to get our mail. I met Mr. Johnson on the street and he asked me if I would give him a quit claim deed to Section Nine. I said no. That was the amount of the whole thing.

"Q. Mr. Jenkins, did you state at that time or in that conversation that when the land was officially surveyed that if any of Section Nine was under your fence you would comply with the survey and move your fence onto the officially surveyed line?

"A. No, sir.

"Q. Have you ever made such statement to Mr. Johnson?

"A. No.

"Q. Mr. Jenkins, did you go with him to the office of the Oregon & Western Colonization Company?

"A. No, sir, I was never in his office.

"Q. Are you familiar with the time or the approximate time that your brother signed a sales contract with the Oregon & Western Colonization Company to purchase certain land in Section Nine?

"A. No, I don't know anything about what happened with the company.

\* \* \*

"Q. Mr. Jenkins, did Mr. Johnson state to you the reasons he wished you to give him a quit claim deed to Section Nine?

"A. No.

"Q. He didn't state in the conversation the reason for which he asked you for a quit claim deed to Section Nine?

"A. No, I didn't ask him no reason.

"Q. Your memory is pretty clear about the substance of this conversation with Mr. Johnson?

"A. Why, I think so."

The words just quoted completed the testimony. Thomas Jenkins did not testify. We believe that the foregoing gives an adequate review of that part of the evidence which bears upon the issue of adverse possession.

■ In this state, the principles of law are not in the form of potter's clay, which determine whether one has gained title to land through adverse possession who held up to a fence, which it later develops did not mark the true boundary line. The form of the law which governs such a situation has become well defined and established through repeated judicial determinations. If the occupant, although having had possession for the requisite period, was prepared to move his fence back to the true line, whenever discovered, his possession lacks the requisite element of hostility. In such a case, his possession, however long it may have continued, gains nothing for him. Possession alone does not suffice—it is necessary that the possessor claim ownership of the land up to the fence, whether the latter stands upon the true line or not. A mistake about the location of the line is immaterial if the claimant asserted title up to the boundary marker. If the claimant's possession was accompanied with the element of hostility, that is, an absolute claim of title up to the fence, then he acquired title, even though he mistakenly assumed that the fence marked the correct line. Such has been the law of this state ever since the decision in *Caufield v. Clark,* 17 Or. 473, 21 P. 443, 11 Am. St. Rep. 845. From that decision, we quote:

"We think it is fairly established by the evidence that the plaintiff has occupied and claimed title to the fence as originally located, which was not on the line as described in the deed, although by mistake he supposed it was on such line. * * * We think, therefore, the fence has become the true boundary line of the adverse possession, * * *."

A late succinct expression of the principle enunciated and employed in that early case was made recently by our present CHIEF JUSTICE in *Newton v. McKeel,* 142

Or. 674, 21 P. (2d) 206. The latter decision collates the earlier ones. The issue before us, therefore, does not require a determination of the principle of law, but rather a determination of the facts.

It is essential to ascertain, therefore, whether the evidence above reviewed shows that the defendant, in his half century of occupancy of the strip now in dispute, assumed that his right to it was dependent upon the results of an eventual survey, or whether, after he entered into possession, he claimed absolutely as his own all of the land up to the fence.

For fifty years the defendant deemed the ramparts of his little domain—this ancient fence—as the boundary line. He watched those ramparts and maintained the fence. He occupied everything up to the latter and dealt with the property as absolute owner. No one questioned his right to the land west of the fence until the plaintiff appeared. In the area that the defendant, for a half century, believed to be his property he made valuable improvements, and permitted one of his tenants to move upon it a house which was built some years previously upon land that clearly belonged to the defendant. After the house was moved, the defendant spent substantial sums in remodeling it. Thus, the area in dispute became the most valuable in that vicinity.

Since men do not make valuable improvements upon land concerning which they entertain doubts, the defendant's long-continued course of conduct concerning the strip which the plaintiff now claims is cogent proof that he deemed it—in fact, claimed it—as his own. It is true that the record contains no evidence that he went about voicing claims of ownership to the area now in dispute; but no man who feels sure of his title voices claims of that kind. They do exactly as the defendant

did—remain silent in a belief which no one questions. In still another particular their conduct matches the defendant's: they pay the taxes, make improvements and quietly enjoy the fruits of ownership. It seems to us that the defendant's long-continued conduct unequivocally shows that he claimed for himself absolute title up to the fence.

It is true that, as a witness, the defendant testified: "I always claimed that on Section Eight, that is all I ever claimed, I never claimed any land in Section Nine." Many witnesses, when pressed hard by a cross-examining attorney who insists that the witness epitomize everything in a word or two, have felt like Solomon of old—"A word fitly spoken is like apples of gold in pictures of silver." Generally, however, the word eludes the witness and he employs another. Such was the situation in *Dawson v. Abbott,* 184 N. C. 192, 114 S. E. 15, which passed upon a situation very similar to the one before us. We quote from that decision:

"Plaintiff claimed the land as his own, without having any doubt about his right and just claim to it, * * *. Plaintiff did say while testifying that he did not intend to claim any land not rightfully belonging to him, * * *. When he said that he would not claim land that did not belong to him, he did not mean that he was doing such a thing, but only claiming that which was his. Even if there had been a mistake originally as to the location of the true line, yet if the plaintiff asserted it to be at a certain place, and occupied and claimed up to it in his own right, although he may have been mistaken as to where the true line was, his possession would still be adverse."

It seems to us that the defendant, in giving the testimony upon which the plaintiff depends, meant that he

claimed as his own everything up to the fence, and that he assumed that the fence stood upon the line which separated Sections 8 and 9. When he said that he claimed nothing in Section 9, he did so, we believe, pursuant to a conviction that the true line included the area in dispute. No other interpretation of the testimony upon which the plaintiff relies would harmonize with the defendant's long-continued course of conduct.

■ So far we have not disposed of Johnson's affidavit. It is evident that the trial judge did not believe that the affidavit correctly narrated the conversation which Johnson and the defendant had in 1912. Building up titles by the secret filing of affidavits in private offices is not a practice worthy of encouragement. The defendant, in unequivocal testimony, denied the statements attributed to him in Johnson's affidavit. The trial judge, with characteristic alertness, questioned many of the witnesses closely, so as to assure himself of a correct understanding of them and of their testimony. Since he pursued that course, we believe that his rejection of the affidavit ought to be followed by us, in the absence of some good reason for a different course. We know of none. To the contrary, it seems to us that the defendant, after twenty years of occupancy in which he made many improvements upon the area adjacent to the fence, would not have been likely to have made the declarations recounted in the affidavit. We can not accept the latter as the truth.

■ The above disposes of the first assignment of error. We believe that the defendant's possession of the contested strip was continued for more than the statutory period, that it was hostile, and that it was maintained under a claim of ownership.

We come now to the second assignment of error. It is:

"The Court erred in excluding evidence of the declarations of Thomas E. Jenkins, Sr., made after the sale of his interest in Section Eight."

Thomas E. Jenkins, Sr., is the individual to whom we have been referring as Thomas Jenkins.

The nature of the testimony which was excluded by the ruling now under review is thus indicated in the appellant's brief:

"At the trial of this case, plaintiff testified to certain declarations made to her by Thomas E. Jenkins, Sr., after he had reconveyed his interest in Section Eight to his brother, explaining the reasons for purchasing the tract in Section Nine from the Colonization company. Upon objection made by the defendants testimony of these statements was introduced under the ruling (Tr. p. 114). Declarations and acts of Mr. Jenkins made while he was in possession of both tracts were introduced in evidence under the former ruling of the Court."

■ As we said, Thomas Jenkins was not a witness. It was sought to introduce his declarations through the medium of the plaintiff as a witness. It will also be seen from the words of the assignment of error that the purported declarations were "made after the sale of his (Thomas Jenkins') interest in Section Eight." Thomas Jenkins became a half owner of Section 8 in 1902 and parted with his interest in 1906. Since he did not purchase the West ½ of Section 9 until 1912, his purported declarations were not made until six years after he had parted with his interest in Section 8; and it will be observed that they were not intended to explain his connection with Section 8, but "the reasons for purchasing the tract in Section Nine." In support of

this assignment of error, the appellant cites 2 C. J., Adverse Possession, p. 272, § 611, which says:

"Admissions or declarations made by claimant showing or tending to show that his possession was not hostile are admissible to prove such fact, * * *."

■ The plaintiff, and not Thomas Jenkins, the purported author of the declarations, is the claimant. We are satisfied that no error was committed when the ruling under attack was made: Wigmore on Evidence, 3d ed., §§ 1775-1781. This assignment of error, therefore, discloses no merit.

The above disposes of all contentions advanced by the appellant. We have not mentioned every authority which her counsel cites, but all have received careful attention. We find no error.

The decree of the circuit court is affirmed.